UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: OXFORD EXPOSITIONS, LLC                CASE NO. 10-16218-DWH

OPINION

On consideration before the court are the following:

1. Emergency motion for authority to enter into a joint venture agreement filed by the debtor, Oxford Expositions, LLC, ("Oxford Expo"); an objection to this motion filed by Questex Media Group, LLC, ("Questex").

2. Questex's motion to stay the rendering of a decision by this court regarding Oxford Expo's emergency motion to enter into the aforesaid joint venture agreement.

3. Questex's motion seeking relief from the automatic stay in order to pursue a cause of action against Oxford Expo pending in the United States District Court for the Northern District of Mississippi, Civil Action No. 3:10-cv-0095, which had been previously removed from the Chancery Court of Lafayette County, Mississippi.

And the court, having conducted an evidentiary hearing and considered the memoranda submitted by the parties, hereby finds as follows:

I.

JURISDICTION

The court has jurisdiction of the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(A), (G), and (O).

II.

## FACTUAL SUMMARY

On April 15, 2007, pursuant to a Stock Purchase Agreement, ("SPA"), Questex Media Group, Inc., ("Old Questex"), purchased all of the shares of stock of Oxford Publishing, Inc., ("Oxford Publishing"), and Oxford Communication, Inc., ("Oxford Communication"), from Dr. Edwin E. Meek ("Meek"), and others, for the total consideration of $40,000,000.00. Oxford Publishing and Oxford Communication were engaged in the business of publishing magazines related to the hospitality industry, as well as, the promotion and management of trade shows related to this same industry throughout the United States. As a part of the SPA, Meek expressly agreed not to engage directly or indirectly in businesses like those conducted by Oxford Publishing or Oxford Communication, as well as, businesses proposed to be conducted by Oxford Publishing or Oxford Communication for a period of five years from the closing date of the SPA. The non-competition and non-solicitation provision is found in paragraph 6.6 of the SPA, and the definition of "Business" is found in the definition section on page 2. (See Debtor's Exhibit 7.) To understand the scope of the non-compete, both of these provisions must be read together.

On October 9, 2009, QMG Acquisition, LLC, ("QMG Acquisition"), entered into an Asset Purchase Agreement, ("APA"), with Old Questex, Oxford Publishing, Oxford Communication, and others, through which QMG Acquisition proposed to purchase predominantly all of the assets of the selling entities. On that same date, Old Questex, Oxford Publishing, Oxford Communication, and the other selling entities filed voluntary Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware.

Thereafter, on November 24, 2009, the bankruptcy court entered an order approving the APA. (See Questex Exhibit 5.)

At the hearing, Oxford Expo questioned whether the APA actually included the SPA by which Old Questex had acquired the stock of Oxford Publishing and Oxford Communication. Questex responded by introducing into evidence Schedule 1.1(b), (Questex Exhibit 2), which it asserts was attached to the APA, thus indicating that the SPA was indeed included in the asset sale. The attorneys representing Oxford Expo and Meek indicated that Schedule 1.1(b) did not appear electronically in the Delaware bankruptcy court file. Regardless, if this schedule was attached to the APA, then the SPA was likely included in the transaction. On December 16, 2009, a Bill of Sale Assignment and Assumption Agreement, (Questex Exhibit 6), was executed which effectively consummated the APA by conveying the assets from Old Questex, Oxford Publishing, Oxford Communication, and the other selling entities to QMG Acquisition.

On December 17, 2009, QMG Acquisition changed its corporate name through the Office of the Delaware Secretary of State to Questex Media Group, LLC, the party now involved in these proceedings. In January, 2010, Old Questex, Oxford Publication, and Oxford Communication changed their corporate names respectively to QMG Winddown, Inc., OPI Winddown, Inc., and OCI Winddown, Inc.

An event, which caused a significant amount of confusion regarding the efficacy of the APA, particularly whether it included the SPA, occurred on June 21, 2010, approximately seven months after the entry of the aforementioned order by the Delaware bankruptcy court approving the APA. This involved the filing of a motion in the bankruptcy court by QMG Winddown, OPI Winddown, OCI Winddown, and the other debtor entities requesting the entry of an order

3

authorizing the rejection of thirteen executory contracts. This motion specifically included the SPA even though it had already been purportedly transferred out of the bankruptcy estates pursuant to the APA. An order rejecting these executory contracts, specifically listing the SPA, was entered by the Delaware bankruptcy court on July 25, 2010. (See Debtor's Exhibit 10.) The attorneys representing Questex contend that this was simply a mistake since the SPA had already been conveyed and thus removed from the bankruptcy estates.

Meek testified at the hearing that when he saw the order rejecting the SPA, he thought, with good reason, that the non-compete provision in the SPA was no longer effective. Of course, if the SPA had previously been properly transferred from the bankruptcy estates, there would have been no SPA executory contract to reject.

On August 16, 2010, after their corporate names had been changed, the bankruptcy cases of Old Questex, Oxford Publishing, and Oxford Communication were dismissed. (See Debtor's Exhibits 12 and 13.)

III.

FACTUAL BACKGROUND REGARDING
JENNIFER ROBINSON'S OBLIGATIONS UNDER
THE NON-COMPETE PROVISIONS IN HER EMPLOYMENT
AGREEMENT, AS WELL AS, HER CONSULTING AGREEMENT

Jennifer Robinson, who had been employed by Oxford Publishing for a number of years, entered into an Employment Agreement with Oxford Publishing on January 1, 2006. (See Debtor's Exhibit 2.) Coincidentally, in this Employment Agreement there is a description of the business activities conducted by Oxford Publishing which will be discussed in detail hereinbelow.

The provision in the agreement addressing Robinson's non-compete obligation was paragraph 12(e)(1), which provides as follows:

(e) <u>Non-Competition: Non-solicitation.</u>

(1) During the Employment Term and for three (3) years thereafter (the "Non-Competition Period"), Executive will not, directly, or indirectly, own, manage, operate, join control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, partner, principal, agent, representative, consultant or otherwise with, or use or permit Executive's name to be used in connection with, any business or enterprise within the Territory that competes with the Corporation or its affiliates, including, without limitation, any engagement in any publishing or trade show business directed at the hospitality, nightclub, bar and food and beverage industries or any other such business that Corporation may conduct or start publishing or trade show activities while Executive is employed with the Corporation (the "Business"). The term "Territory" means all states in which the Corporation currently, or at the time of termination of employment, operates or has discussed or considered expanding. Executive acknowledges and agrees that the Territory identified in this §12(e) is the geographic area in or as to which she is expected to have supervisory responsibilities and/or otherwise to perform services for the Corporation, by being actively engaged as a member of the Corporation's management team as Chief Operating Officer during her employment with the Corporation. The provisions of this section shall survive the termination or expiration of this Employment Agreement and remain binding upon Executive for the period herein set forth. Further, this covenant, on the part of Executive, shall be construed as a separate agreement, independent of any other provision herein set forth; and the existence of any claim or cause of action by Executive against Corporation, whether predicated on this Employment Agreement or any other provision hereof, or otherwise, shall not constitute a defense to the specific enforcement by Corporation of this covenant. Executive acknowledges and agrees that the restrictive covenant set forth in this Employment Agreement is reasonable, that Executive has been adequately compensated under this Employment Agreement for the future financial hardship that compliance with this covenant might otherwise have created, and that Executive has available other suitable employment opportunities (outside the Business and otherwise) which eliminate the need for or desirability of employment within the Business.

Following the closing of the SPA, Robinson continued her employment with Oxford Publishing until she voluntarily terminated the Employment Agreement on September 28, 2008. On October 27, 2008, she entered into a Consulting Agreement with Oxford Publishing which apparently modified the scope of her employment. (See Debtor's Exhibit 3.) A revised non-compete provision was inserted in the Consulting Agreement at paragraph 1.2, which provided as follows:

> 1.2 The parties further acknowledge and agree that, the Consultant's resignation of employment and resulting termination of the Employment Agreement notwithstanding, the provisions of Section 12 of said Employment Agreement shall survive, and the covenants of the Consultant therein are hereby re-made by, and will apply to the Consultant during the Consulting Period and thereafter, as therein provided, *mutatis mutandis*; provided, (a) the "Non-Competition Period" defined in Section 12(e)(1) thereof shall expire on the later to occur of (i) October 31, 2011, or (ii) the second anniversary of the termination of this Agreement, however occasioned; and (b) the "Territory" defined in Section 12(e)(1) thereof shall mean that geographic area where the Company conducts business as of the date of termination; and (c) the competitive activities which the Consultant agrees to refrain from engaging as provided in Section 12(e)(1) thereof shall also include any other business in which the Consultant provides services to the Company under this Agreement. The Consultant reaffirms the reasonableness and necessity of such restrictions continuing following her resignation and during the Consulting Period and thereafter, as provided.

Coming as a surprise to Robinson, Questex ceased paying her monthly retainer of $14,166.66 in January, 2009, just two months following the execution of the Consulting Agreement. Contrary to paragraph 4 of the Consulting Agreement, Robinson was not given a thirty day written notice of termination. Robinson made inquiry about the non-payment and was sent a letter by Attorney David Amidon with the law firm of Burns and Levinson, LLP, advising that she had violated her contractual obligations with Oxford Publishing by soliciting Oxford

Publishing customers and/or interfering with Oxford Publishing's business relations. (See Debtor's Exhibit 5.) Robinson denied the accusations, but took no further action to enforce her rights under the agreement.

No evidence was presented to the court to substantiate the allegations set forth in Amidon's letter. Consequently, without further explanation, the unilateral termination of the payment of compensation to Robinson, particularly in the absence of a written thirty day notice of termination, constitutes a breach and a de facto termination of the Consulting Agreement by Oxford Publishing.

Questex pointed out that the non-compete provision in the Employment Agreement was "remade" and incorporated into the Consulting Agreement. The initial agreement included a three year non-compete period following Robinson's termination of employment. However, the Consulting Agreement redefined the <u>non-compete period</u> as follows:

> (a) the "Non-Competition Period" defined in Section 12(e)(1) thereof shall expire on the later to occur of (i) October 31, 2011, or (ii) the second anniversary of the termination of this Agreement, however occasioned;

Consequently, insofar as the <u>non-compete period</u> is concerned, the provision in the Consulting Agreement specifically supercedes the provision in the Employment Agreement.

Since Oxford Publishing breached and arbitrarily terminated Robinson's Consulting Agreement after only two months without providing a written notice of termination, this court concludes that it would be unconscionable to require Robinson to comply with the non-compete provision for a time period approximating two years and ten months.

In *Empiregas, Inc. of Kosciusko v. Bain*, 599 So.2d 971 (Miss. 1992), the Mississippi Supreme Court found that when an employee was terminated without good cause, the employer

7

was not entitled to enforce a non-competition clause set forth in the employment agreement. The following language of the court is instructive, to-wit:

> Non-competition agreements have been viewed by this Court as "restrictive contracts [which] are in restraint of trade and individual freedom and are not favorites of the law." *Frierson v. Sheppard Building Supply, Co.,* 247 Miss. 157, 154 So.2d 151, 156 (1963); *Texas Road Boring Company of Louisiana-Mississippi v. Parker,* 194 So.2d 885, 888 (Miss. 1967). Only when such agreements are reasonable, will they be considered valid and upheld by this Court. *Frierson,* 154 So.2d at 156. However, when the Chancellor finds that the employee's termination was arbitrary, capricious or in bad faith, he can "lend the hand of equity" in refusing to enforce the agreement.

*Id.* at 975.

As noted above, on October 9, 2009, several months after Robinson's termination, Old Questex and Oxford Publishing filed their Chapter 11 bankruptcy cases in the District of Delaware. There is no indication that either debtor took any action during the administration of their bankruptcy cases to assume that part of the Consulting Agreement which applied to Robinson's obligation not to compete. In the absence of a valid assumption, there is a serious question as to whether Questex, as the ultimate transferee/assignee of the SPA, can now enforce the non-compete provision against Robinson. (Parenthetically, the court recognizes that Robinson's non-compete obligation was addressed in paragraph 3.19.1(i) of the SPA, but that does not necessarily mean that Old Questex or Oxford Publishing can assign or transfer the non-compete without first effectuating an assumption.)

In summary, the following factors lead this court to the inescapable conclusion that the non-compete provision set forth in the Consulting Agreement, as well as, the remnant of the non-compete which was brought forward from the Employment Agreement, are unenforceable insofar as Robinson is concerned, to-wit:

1. Oxford Publishing breached the Consulting Agreement by failing to give Robinson a thirty day written notice prior to unilaterally terminating said agreement.

2. Since Oxford Publishing only honored the Consulting Agreement for a period of two months, and then arbitrarily breached the agreement by effectively terminating Robinson without notice, requiring Robinson to comply with the non-compete provision for a period of two years and ten months, i.e., through October 31, 2011, would be unconscionable.

3. The Consulting Agreement was not assumed by Oxford Publishing or Old Questex during the administration of their bankruptcy cases. Therefore, any purported assignment and/or transfer of Robinson's non-compete through the APA is legally flawed. From the evidence presented, it also appears that Oxford Publishing, which would now officially be known as OPI Winddown, Inc., is no longer a viable existing entity that has a legitimate reason to enforce Robinson's non-compete.

The court is compelled to render a decision on this issue because Robinson is an integral participant in the proposed joint venture that is contemplated by Oxford Expo's emergency motion.

IV.

RETENTION OF EXCLUSIVE JURISDICTION
BY THE DELAWARE BANKRUPTCY COURT

As set forth hereinabove, on November 24, 2009, the Bankruptcy Court in the District of Delaware entered an order approving the APA. (Questex Exhibit 5.) Paragraph 53 of this order contained the following language, to-wit:

53. This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order, the Bidding Procedures Order, and the Asset Purchase Agreement in all respects and to decide any disputes concerning this Order and the Asset Purchase Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Asset Purchase Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased

> Assets and Transferred Equity Interests and any Purchased Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Liens, Claims, Encumbrances and Interests.

At the hearing on Oxford Expo's emergency motion for authority to enter into the joint venture, the attorneys representing Questex raised the aforementioned language, contending that the adjudication of Oxford Expo's emergency motion required a determination by the Delaware bankruptcy court of the provisions of the APA and/or the effect of the APA sale authorizing order. In view of the fact that these same attorneys requested the United States District Court for the Northern District of Mississippi to consider the effect of the APA and the sale order in Questex's counterclaim against Oxford Expo, Meek, and Robinson, the court finds that the positing of this argument now is somewhat disingenuous and judicially inconsistent. (See Meek Exhibit 1, Questex's Answer and Counterclaim, paragraphs 50 - 62, pages 14 - 16.)

Insofar as the matter before this court is concerned, the impact of the APA and the sale order are not difficult to discern. The first question that must be answered is whether the APA, which was approved by the sale order, included the SPA. (Debtor's Exhibit 7). As mentioned earlier, this only necessitates a determination by the court as to whether Schedule 1.1(b) was actually attached to the APA. From what this court has seen thus far, it appears likely that the Delaware debtor entities intended to include the SPA in the APA transaction. Otherwise, Oxford Publishing and Oxford Communications would not have been parties to the APA. If this proves to be correct, effective December 16, 2009, the date of the Bill of Sale Assignment and Assumption Agreement, the SPA was transferred from the bankruptcy estates of Old Questex, Oxford Publishing, and Oxford Communication. *See, In re Hall's Motor Transit Co. v. Central*

*Transport, Inc.*, 889 F.2d 520, 522 (3rd Cir. 1989); *In re DVI, Inc. v. National Medical Imaging, LLC,* 305 B.R. 414 (Bankr. D. Del. 2004); and *In re Mariner Post-Acute Network, Inc.*, 267 B.R. 46 (Bankr. D. Del. 2001).

The only other question, which becomes somewhat meaningless, even though the court's curiosity has certainly been piqued, is why the SPA was included in the motion and later the order, dated July 25, 2010, which expressly authorized the rejection of the SPA. (See Debtor's Exhibit 10.) This latter event was certainly a "green light" for Meek to assume that the SPA's non-compete provision was no longer applicable.

Rendering a decision on Oxford Expo's emergency motion does not actually require the court to interpret the APA or the related sale order. Even if it did, Oxford Expo's emergency motion is extremely time sensitive, and the court does not have the luxury of being able to refer this matter to the Delaware bankruptcy court for consideration. Indeed, since the bankruptcy cases of Old Questex, Oxford Publishing, and Oxford Communication were dismissed on August 16, 2010, the case files are likely closed and would have to be reopened before any decision could be rendered. A delay of this nature, as Questex well knows, would effectively moot the emergency motion.

IV.

## DOES THE MOTION OF OXFORD EXPO TO ENTER INTO A JOINT VENTURE WITH EFFORT GROUP, LLC, AN AFFILIATE OF GLOBAL EXCHANGE EVENTS, VIOLATE THE NON-COMPETE PROVISION OF THE STOCK PURCHASE AGREEMENT

The non-compete provision in the SPA, (Debtor's Exhibit 7), is found at Paragraph 6.6 on Page 38, and reads as follows:

> 6.6  Noncompetition and Nonsolicitation.  For a period of five years from and after the Closing Date, other than as an employee or agent of an Acquired Company, none of the Sellers will, and will cause each of their Affiliates not to, engage directly or indirectly in all or any portion of the Business as conducted as of the Closing Date; provided, however, that no owner of less than 5% of the outstanding stock of any publicly-traded corporation will be deemed to be so engaged solely by reason thereof in the Businesses.  For a period of five years from and after the Closing Date, the Sellers will not, and will cause each of their Affiliates not to, recruit, offer employment, employ, engage as a consultant, lure or entice away, or in any other manner persuade or attempt to persuade, any Person who is an employee of any of the Acquired Companies to leave the employ of the Acquired Companies.  If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 6.12 is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

Succinctly stated, the aforesaid provision prohibits each of the sellers, which includes Meek, his wife and daughter, as well as, two trusts established for the benefit of his grandchildren, from engaging directly or indirectly "in all or any portion of the Business as conducted as of the closing date;..." "Business" is a defined term set forth on page 2 of the SPA

12

and means "the business conducted by the Acquired Companies and proposed to be conducted by the Acquired Companies."

The business activities of Oxford Publishing were innocently described in the Employment Agreement entered into by Oxford Publishing and Jennifer Robinson. (Debtor's Exhibit 2.) That document indicates that Oxford Publishing was engaged in the business of publishing magazines related to the hospitality, nightclub, bar, and food and beverage industries throughout the United States, as well as, the promotion, conduct, and management of trade shows related to the same. The proposed joint venture with Effort Group, LLC, is a one time appointment based event which is completely different from the business conducted by or proposed to be conducted by Oxford Publishing or Oxford Communication when the SPA was closed.

The concept of a trade show was explained by both Meek and Robert Sears Ingram ("Ingram"), the principal owner of Effort Group, LLC. A trade show requires the use of a large convention center where sizeable numbers of exhibitors make their products available for inspection by literally thousands of potential customers. According to Ingram, the appointment based event is limited to a small number of suppliers, in his estimation approximately fifty, to be placed in contact with approximately fifty potential purchasers. The contemplated event will be hosted at a luxury hotel in south Florida and the actual supplier/customer meetings will be arranged through a sophisticated software program developed by Ingram. On cross-examination, Ingram compared a trade show to an appointment based event as an "elephant to a mouse."

As noted in the *Empiregas* opinion of the Mississippi Supreme Court, a non-competition agreement is generally viewed as a restrictive contract which is not favored under the law. *See,*

*Frierson v. Sheppard Building Supply Co.,* 247 Miss. 157, 154 So.2d 151 (Miss. 1963), "These restrictive contracts are in restraint of trade and individual freedom and are not favorites of the law. But they are valid unless unreasonable, and when reasonable, courts will not hesitate to hold the parties to their contracts." *Id.* at 172; *Texas Road Boring Company of Louisiana-Mississippi v. Parker,* 194 So.2d 885 (Miss. 1967), "Non-competition agreements are not favored in law and in considering them, courts recognize there are three major aspects to be looked to: the rights of the employer, the rights of the employee, and the rights of the public." *Id.* at 888. "The recurrent theme of these cases is that restrictive covenants are not favored in law; the employer has the burden of proving their reasonableness; and the reasonableness as to time and space limitations must be determined from the facts of each case." *Id.* at 889; *Kennedy v. Metropolitan Life Insurance Company,* 759 So.2d 362 (Miss. 2000), "The validity and the enforceability of a non-competition agreement are largely predicated upon the reasonableness and specificity of its terms, primarily, the duration of the restriction and its geographic scope." *Id.* at 364. "Given the unfavored status of non-competition agreements in the eyes of the law, the burden properly falls on the employer to draft a non-competition agreement which clearly delineates the scope of the employee's permissible business activities following the termination of employment." *Id.* at 367, 68; and *Easy Reach, Inc. v. Hub City Brush, Inc.,* 935 So.2d 1140 (Miss. 2006), "[T]he enforceability of a non-competition agreement [is] largely predicated upon the reasonableness and specificity of its terms, primarily, the duration of the restriction and its geographic scope." *Id.* at 1143. *See also,* Louis H. Watson, Jr., *Enforceability of Covenants not to Compete in Mississippi,* 64 Miss. L.J. 703 (Spring, 1995).

Considering the foregoing, this court takes the position that the SPA's non-compete language should be narrowly construed. While there apparently was some conversation about an appointment based event that occurred between Meek and Kerry Gumas, the President of Questex, the testimony of Meek and Robinson at the hearing was unequivocal that neither Oxford Publishing or Oxford Communication had ever participated in an appointment based event and did not contemplate conducting such an event at the time the SPA was closed. Consequently, this court concludes that the joint venture agreement that Oxford Expo proposes to enter into with Effort Group, LLC, does not violate the non-competition: non-solicitation provision in the SPA even though the contemplated appointment based event is in the hospitality field. Not only is the scope and format of an appointment based event significantly different from a trade show, an appointment based event is not covered within the SPA's "Business" definition. Questex's assertion that the SPA's non-compete provision precludes the proposed joint venture between Oxford Expo and Effort Group, LLC, is an unreasonable interpretation of the provision. If the joint venture involved the publication of a magazine or the promotion and management of a trade show, applicable to the hospitality industry, the court's decision would perhaps be entirely different.

Therefore, the court is of the opinion that the emergency motion filed by Oxford Expo to enter into the joint venture for an appointment based event with Effort Group, LLC, is well taken. It will be approved by a separate order, authorizing the transaction, to be entered contemporaneously herewith.

In addition, Questex's motion to stay the rendering of a decision by this court is not well taken and will be overruled.

This court has now received the order of the U.S. District Court, Northern District of Mississippi, referring Civil Action No. 3:10-cv-0095 to this court for adjudication. As such, the motion for relief from the automatic stay filed by Questex is temporarily moot. The automatic stay does not preclude Questex from litigating or enforcing its claims in the bankruptcy court. Following due consideration, if this court determines that certain parts or aspects of the cause of action require adjudication in the district court, such as a Seventh Amendment right to a jury trial, the action will be referred back to the district court for disposition. At that time, the automatic stay will be lifted accordingly without the necessity of Questex refiling a second motion for relief.

This the 25th day of March, 2011.

/s/ David W. Houston, III
DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE